682 F.2d 12
 EAGLE-PICHER INDUSTRIES, INC., Plaintiff, Appellant,
v.
LIBERTY MUTUAL INSURANCE COMPANY, et al., Defendants, Appellees.
EAGLE-PICHER INDUSTRIES, INC., Plaintiff, Appellee,
v.
LIBERTY MUTUAL INSURANCE COMPANY, et al., Defendants, Appellees,
Philip Alan Froude, et al., Defendants, Appellants.
EAGLE-PICHER INDUSTRIES, INC., Plaintiff, Appellee,
v.
LIBERTY MUTUAL INSURANCE COMPANY, et al., Defendants, Appellees,
American Motorists Insurance Company, Defendant, Appellant.
 Nos. 81-1761 to 81-1763.
 United States Court of Appeals,
First Circuit.
 Argued March 4, 1982.
Decided June 30, 1982.
 
 Malcolm B. Rosow, with whom Lewis Herman, Arthur Liederman, Standard, Weisberg, Heckerling & Rosow, New York City, Erik Lund, Robert T. Harrington, David J. Hatem, and Posternak, Blankstein & Lund, Boston, Mass., were on brief, for Philip Alan Froude, et al.
 Francis J. Bousquet, with whom Frank A. Smith, III, T. Mark Herlihy, and Herlihy & O'Brien, Boston, Mass., were on brief, for American Motorists Ins. Co.
 Charles R. Parrott, with whom Andrew J. McElaney, Jr., Brian T. Kenner, Robert S. Brintz, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for Eagle-Picher Industries, Inc.
 Christopher C. Mansfield, with whom Lawrence A. Podolski, Robert C. Macaulay, Nancy A. Froude, Candace L. Sutcliffe, Boston, Mass., Gerald V. Weigle, Jr., and Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, were on brief, for Liberty Mut. Ins. Co.
 George Marshall Moriarty, with whom John M. Harrington, Jr., Kenneth W. Erickson, and Ropes & Gray, Boston, Mass., were on brief, for The Manifestation Companies and Underwriters in the London Market.
 Charles A. Lynberg, R. Jeff Carlisle, and Lynberg & Nelsen, Los Angeles, Cal., on brief, for American Home Assur. Co., et al., amicus curiae.
 Stephen McReavy, Jeffrey Kaufman, Stephen Dennis, Wallace Tice-Wallner, and Hall, Henry, Oliver & McReavy, San Francisco, Cal., on brief for Fireman's Fund Ins. Co., et al., amici curiae.
 F. Lee Bailey, Kenneth J. Fishman, and Law Offices of F. Lee Bailey, Boston, Mass., on brief, for Commercial Union Ins. Companies, amicus curiae.
 John G. Niles, Ira M. Feinberg, Martin S. Checov, and O'Melveny & Myers, Los Angeles, Cal., on brief for Ins. Co. of North America, amicus curiae.
 Robert N. Sayler, Elizabeth W. M. Teel, John E. Heintz, Scott D. Gilbert, Covington & Burling, Washington, D. C., John J. Curtin, Jr., A. Van C. Lanckton, Bingham, Dana & Gould, Boston, Mass., Curtis M. Caton, Robert S. Venning, Stephen N. Goldberg, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Gael Mahony, Hill & Barlow, Boston, Mass., E. Judge Elderkin, William R. Irwin, Brobeck, Phleger & Harrison, San Francisco, Cal., William P. Manning, Jr., Wright, Manning & Sagendorph, Norristown, Pa., James A. Young, Philadelphia, Pa., James M. White, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., Thomas C. MacDonald, Jr., Charles P. Schropp, Shackleford, Farrior, Stallings & Evans, Tampa, Fla., Robert R. Reeder, Cozen, Begier & O'Connor, Philadelphia, Pa., David A. Welte, and Polsinelli, White & Schulte, Kansas City, Mo., on brief for Armstrong World Industries, Inc., et al., amici curiae.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.*
 COFFIN, Chief Judge.
 
 
 1
 Eagle-Picher Industries, Inc., manufactured a variety of industrial insulation products containing asbestos. Beginning in the late 1960's, and accelerating rapidly in the mid-1970's, Eagle-Picher has been named as a defendant in lawsuits in which plaintiffs allege personal injury or wrongful death resulting from the inhalation of asbestos from Eagle-Picher's products. Between 1968 and 1980, Eagle-Picher was covered by numerous insurance policies provided by several different carriers. In 1977, Eagle-Picher's primary insurer, Liberty Mutual Insurance Co., notified Eagle-Picher that the policy limits for 1974 and 1975 were about to be reached. Eagle-Picher sent this notice to its excess insurers, American Motorists Insurance Co. and various underwriters in the London Market. American Motorists responded, arguing that Liberty Mutual had been construing its policy incorrectly and implying that Liberty Mutual's coverage would not be exhausted under a proper interpretation. The London Market sent a reservation of rights letter to Eagle-Picher, pending resolution of the correct theory of insurability. Eagle-Picher subsequently brought this action, seeking a declaration of the rights and liabilities of its various insurers pursuant to the applicable policies.
 
 
 2
 Two theories of insurance coverage were presented to the district court. Eagle-Picher, Liberty Mutual, and various London Market underwriters referred to as the "Bird" underwriters argued for a "manifestation" theory: those insurers on the risk at the time the asbestos-related disease first manifested itself by way of medically diagnosable symptoms must provide coverage. American Motorists, and other London Market insurers known as the "Froude" underwriters, argued for an "exposure" theory: those insurers on the risk at the time of exposure to asbestos must indemnify Eagle-Picher for a pro-rata share of its liability, the proportion to be determined by the ratio of the number of years the insurer was on the risk to the total number of years of exposure. The district court, relying on the common meaning of the policy language, the medical evidence relating to asbestosis, and the policy of construing insurance contracts to promote coverage, ruled that the manifestation theory was correct. 523 F.Supp. 110 (D.Mass.1981).
 
 
 3
 The exposure theorists have appealed, alleging that the district court erred by excluding extrinsic evidence of Eagle-Picher's intent in obtaining the policies and that the court misconstrued the policies as a matter of law. Eagle-Picher has cross-appealed, relying on the recent decision in Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C.Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), to argue for the first time that all policies in force from the time of initial exposure until and including the time of manifestation are triggered by an asbestosis claim. Eagle-Picher also urges that the district court chose the wrong date of manifestation. Less consequential contentions are dealt with in the margin.[1] For the reasons that follow, we agree with most of the district court's thoughtful opinion but modify its judgment in part.
 
 
 4
 Eagle-Picher was uninsured for liability resulting from exposure to its asbestos products prior to 1968. Between January 1, 1968, and January 1, 1980, Liberty Mutual provided Eagle-Picher with primary comprehensive liability insurance. From June 1, 1973, until October 1975, American Motorists provided Eagle-Picher with first layer excess umbrella coverage; from October 1975 through January 1, 1979, the London Market provided Eagle-Picher with first layer excess coverage. Each of these policies contains independent coverage clauses and definitions. In addition, the London Market provided Eagle-Picher with second layer excess coverage from September 1, 1973, to January 1, 1979; these policies incorporate by reference the terms of the underlying first layer excess policies. The excess policies go into effect only if the policy limits of the underlying coverage layer become exhausted.
 
 
 5
 The coverage clauses, which are set out in detail in the district court's opinion, are virtually identical, with the exception of the American Motorists policy. In essence, the insurer agrees to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... caused by an occurrence." An "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury." "Bodily injury" is defined as "bodily injury, sickness or disease." It is clear from this language that each occurrence is made up of two components, the exposure and the resulting bodily injury; and it is the resulting bodily injury, not the exposure, which must take place "during the policy period." 523 F.Supp. at 114; see also Keene, supra, 667 F.2d at 1040; American Motorists Ins. Co. v. E.R. Squibb & Sons, Inc., 95 Misc.2d 222, 406 N.Y.S.2d 658, 659-60 (Sup.Ct.1978). The American Motorists policy states that the insurer shall indemnify the insured for liability due to "personal injury caused by ... an occurrence which takes place during the policy period." (Emphasis added.) The definition of "occurrence", however, is substantially identical to that in the other policies, as is the definition of "personal injury" as "bodily injury, ... sickness or disease."
 
 
 6
 The principal issue in this case is whether asbestosis "results" soon after initial and subsequent exposure to asbestos, or whether the disease "results" when it becomes clinically evident or manifest. Secondarily, we must decide when an "occurrence ... takes place" under the terms of the American Motorists policy.
 
 
 7
 Insurance policies are generally interpreted in the same way as other contracts.[2] In construing the policies at issue, our dominant purpose is to give effect to the intentions of the parties. Where the relevant language is unambiguous and the application of the policy to the relevant facts is clear, that intent must be ascertained by the plain and ordinary meaning of the contract language. Where, however, the policy terms are ambiguous and the coverage issue is reasonably disputed, a court may consider extrinsic evidence of the surrounding circumstances and of the parties' intent. For example, evidence of the construction given to the language by the parties and of the customary usage of persons in the same commercial setting is normally admissible. If the meaning of the policy terms remains unclear, the policy is generally construed in favor of the insured in order to promote the policy's objective of providing coverage. See generally Pavlik v. Consolidation Coal Co., 456 F.2d 378, 380-81 (6th Cir. 1972) (Ohio law); Bright v. Ohio Casualty Ins. Co., 444 F.2d 1341 (6th Cir. 1971) (Ohio law); Olmstead v. Lumbermens Mutual Ins. Co., 22 Ohio St.2d 212, 259 N.E.2d 123, 126 (1970); Construction Advancement Program v. A. Bentley & Sons Co., 45 Ohio App.2d 13, 340 N.E.2d 849, 853 (1975); Zelinsky v. Associated Aviation Underwriters, 478 F.2d 832, 834 (7th Cir. 1973) (Illinois law); Universal Underwriters Ins. Co. v. Northwestern Nat'l Ins. Co., 306 F.Supp. 437, 439 (S.D.Ill.1969) (Illinois law); Olipra v. Zambelli, 1 Ill.App.3d 607, 274 N.E.2d 877, 879 (1971); 13 J. Appleman & J. Appleman, Insurance Law and Practice §§ 7381, 7384, 7385, 7388, 7401 (1976).
 
 
 8
 These well settled principles of construction are often easier to state than to apply. Here, for example, all parties agreed that the policy language was unambiguous. The exposure theorists nevertheless urged the court to consider extrinsic evidence of Eagle-Picher's reasonable expectations in signing the policies, not, apparently, to make clear what was unclear but to make more clear what was already clear. There is some authority for this position. Corbin suggests, in a passage apparently not brought to the district court's attention, that evidence of such surrounding circumstances should generally be admitted to enable the court to determine what the "plain and clear" meaning of the contract is. 3 Corbin on Contracts § 542 (1960); see also 4 Williston on Contracts §§ 609, 629 (3d ed. 1961).
 
 
 9
 Given that the primary goal of contract interpretation is to ascertain the intentions of the parties, see Appleman, supra, § 7385; Corbin, supra, § 538; Williston, supra, § 601, a district judge, sitting without a jury, might be well advised to admit provisionally all extrinsic evidence of the parties' intent, unless it is clearly inadmissible, privileged, or too time consuming, in order to guard against reversal. See, e.g., United States ex rel. Placek v. Illinois, 546 F.2d 1298, 1307 n.9 (7th Cir. 1976); Elkins v. Townsend, 296 F.2d 172, 177 (5th Cir. 1961); Builders Steel Co. v. Commissioner of Internal Revenue, 179 F.2d 377, 379 (8th Cir. 1950); 10 Moore's Federal Practice §§ 103.21, 103.23 (1982); 1 Weinstein's Evidence P 103(04) at 103-39 (1981). Where there is adequate admissible evidence to support the findings of the trial judge, any error in admitting other evidence will generally be deemed harmless. See, e.g., Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66, 71 n.11 (3d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972); Baumel v. Travelers Ins. Co., 279 F.2d 780, 783 & n.4 (2d Cir. 1960). The district court here, however, taking the parties' position that the policy language was plain and clear-though the parties were diametrically opposed in their reading of what was plainly and clearly stated-refused the invitation to consider extrinsic evidence of intent, accepting only medical testimony bearing on the nature of asbestosis.
 
 
 10
 Based on this evidence, the district court found that asbestosis is an injurious process which begins with the deposition of asbestos fibers in the lung, causing tiny sub-clinical "insults" to the lung tissue, and ends with the manifestation of clinically evident disease after a period of as much as twenty years or longer. The medical experts agreed that the sub-clinical injuries do not occur simultaneously with initial exposure; rather, before any "insults" to the lung occur, the asbestos fiber must travel through a number of passageways in the throat and lungs and evade the body's natural defense mechanisms which are designed to prevent foreign substances from entering the body. "Moreover, even when the fiber has become embedded in the lung and the scarring process has begun, the end result, that is, disabling disease or death, is by no means inevitable." 523 F.Supp. at 115. See also Insurance Co. of North America v. Forty-Eight Insulations, Inc., 451 F.Supp. 1230, 1236-37 (E.D.Mich.1978), aff'd, 633 F.2d 1212 (6th Cir. 1980), modified on reh'g, 657 F.2d 814, cert. denied, --- U.S. ----, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Finally, one expert distinguished between the specialized meaning of "asbestosis" to a research scientist-an injury mechanism which is present soon after the first asbestos fiber is deposited in the lung-and the ordinary meaning of the word to a treating physician or patient-a clinically evident disease.
 
 
 11
 Even adopting the terminology of a medical expert, the policy language does not support the exposure theory. The policies clearly distinguish between the event which causes injury-the accident or exposure-and the resulting injury or disease. Yet, putting aside the American Motorists policy, it is the resulting injury, not the exposure, which must take place "during the policy period" in order to trigger coverage; and it is uncontested that even sub-clinical injury to the lung does not occur simultaneously with the inhalation of asbestos.[3] Nor is the existence of sub-clinical injury an inevitable by-product of exposure, since the body's natural mechanisms may remove the fibers before they become embedded in the lungs. We would also observe that, if a single exposure to asbestos was intended to trigger coverage, the policy language would likely have reflected this intent, rather than defining an "occurrence" in part as a "continuous or repeated" exposure to conditions.
 
 
 12
 Moreover, we agree with the district court that the common, ordinary meaning of the policy language supports the manifestation theory. An individual with tiny sub-clinical insults to her lungs would not say that she had any injury or disease, given one expert's testimony that "over 90% of all urban city dwellers have asbestos-related scarring". Rather, she would say that a disease resulted when she had symptoms which impaired her sense of well-being, or when a doctor was able to detect sufficient scarring to make a prognosis that the onset of manifested disease was inevitable. "Injury" is defined by Webster[4] as "hurt, damage, or loss sustained"; it is a broad term which covers the "result of inflicting on a person or thing something that causes loss, pain, distress, or impairment." As sweeping as this definition is, it is difficult to consider sub-clinical insults to the lung to constitute an "injury" when these insults do not cause "loss, pain, distress, or impairment" until, if ever, they accumulate to become clinically evident or manifest.
 
 
 13
 Finally, the policies distinguish between "bodily injury" and "sickness or disease". If the terms are to have any distinct meaning, "bodily injury" is most easily thought of as an injury caused by external violence or impact. See, e.g., Burns v. Employers' Liability Assur. Corp., 134 Ohio St. 222, 16 N.E.2d 316, 320-21 (1938); Chase v. Business Men's Assur. Co., 51 F.2d 34, 36 (10th Cir. 1931). Asbestosis, by contrast, is normally considered to be a disease, not a bodily injury. Webster defines "asbestosis" as "a form of pneumoconiosis", and this latter term is identified as "a disease of the lungs". "Disease", in turn, is defined as "an impairment of the normal state of the living animal ... or of any of its components that interrupts or modifies the performance of the vital functions". Every disease is presumably preceded by the onset of sub-clinical changes in the body. To state that the disease occurs when these sub-clinical alterations take place, where, as here, the disease does not inevitably or even usually result from the sub-clinical changes, is to subvert the plain meaning of "disease" and to read the term entirely out of the policy.
 
 
 14
 Our view of the plain meaning of the policy language is reinforced by analogous cases involving the interpretation of individual health insurance policies.[5] These agreements often require that illness or disease originate after a certain date in order for coverage to be provided. The courts, relying on the common meaning of the relevant language, have consistently held that the disease does not result until it becomes "manifest or active"; coverage is not defeated by a showing that the disease previously lay dormant in the body. See, e.g., Broccolo v. Horace Mann Mutual Casualty Co., 37 Ill.App.2d 493, 186 N.E.2d 89, 91 (1962); Cohen v. North American Life & Casualty Co., 150 Minn. 507, 185 N.W. 939 (1921); Reiser v. Metropolitan Life Ins. Co., 262 A.D. 171, 28 N.Y.S.2d 283, 286 (App.Div.1941), aff'd per curiam, 289 N.Y. 561, 43 N.E.2d 534 (1942); Wilkins v. Grays Harbor Community Hosp., 71 Wash.2d 178, 427 P.2d 716, 719 (1967). As one oft-quoted commentator has summarized the law, the provisions requiring disease to originate after a specified time "are strictly construed against the insurer, and the illness, disease, or disability will ordinarily be deemed to have its inception when it first becomes manifest or active, or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease." 10 Couch on Insurance § 41:814 at 639 (2d ed. 1962 and 1981 Supp.).
 
 
 15
 The exposure theorists, of course, dispute this characterization of the policy language and of the medical evidence. In their view, sub-clinical insults to the lung clearly constitute "bodily injury". See Forty-Eight, supra, 633 F.2d at 1218-19; Commercial Union Ins. Co. v. Pittsburgh Corning Corp., Civil Action No. 81-2129, slip op. at 22-25 (E.D.Pa. Dec. 4, 1981). Moreover, they argue that evidence erroneously excluded by the district court would have demonstrated that "prior to the initial issuance of the London Market and American Motorists insurance contracts, in 1973, Eagle-Picher knew or reasonably should have expected that coverage under these contracts would be afforded on an exposure basis." They further argue that the fact that Eagle-Picher and Liberty Mutual negotiated a special agreement on April 6, 1972, which provided that all asbestosis claims would be handled on a manifestation basis, shows that Eagle-Picher could not have expected such coverage under the standard policy language in the absence of a special agreement.
 
 
 16
 In reviewing the action of the district court, it is important to note how the issue was raised below. Had it been argued that the policy language was ambiguous and that therefore, under the traditional rule, parol evidence should be admitted to shed light on the meaning of terms, we would have a different and more compelling case. Should we then have determined, contrary to the district court, that the policy language was ambiguous as a matter of law, see, e.g., Keene, supra, 667 F.2d at 1043; Forty-Eight, supra, 633 F.2d at 1222, the exclusion of extrinsic evidence would have constituted error. But the issue of ambiguity was not raised below and has not been urged on appeal, and we therefore do not consider it as a basis for error. The offer of proof specifically recited that, except for medical evidence, "no extrinsic evidence is necessary ... to ascertain the intention of the parties." The offer was put in these terms: "(A) court may, if it wishes to do so, consider objective evidence of some of the circumstances surrounding the making of the agreement ... in order to aid in its interpretation."[6]
 
 
 17
 The precise question before us, therefore, is whether the district court committed either an error of law or abuse of discretion in excluding the evidence offered for the purpose indicated, and whether any such error was harmless. Even Corbin, who was perhaps the principal critic of conventional analysis and advocated the reception of extrinsic evidence to aid in interpretation of even a "plain and clear" contract, Corbin, supra, §§ 542, 579, realized that "(j)ust when the court should quit listening to testimony that white is black and that a dollar is fifty cents is a matter for sound judicial discretion and common sense." Id. § 579 at 420. Assuming arguendo that courts should be more flexible in receiving extrinsic evidence such as antecedent communications to help in interpreting legally plain and clear agreements, we review only for abuse of discretion.
 
 
 18
 The proffered evidence, summarized in detail in the margin, consisted mainly of an exchange of correspondence between Eagle-Picher's corporate insurance manager and the claims supervising personnel of Liberty Mutual concerning three asbestos-related claims between 1969 and 1971.[7] Two of these, the Antholtz and McDaniel claims, seem to be cases where both exposure and manifestation had occurred prior to the issuance of the first Liberty Mutual policy on January 1, 1968. The exchanges made several references to exposure but without reflecting any established, inflexible philosophy. While some letters from both parties intimated a possible lack of coverage because of dates of exposure, others reflected uncertainty on the part of both. Still others revealed a conflict of views, and contributions to the one settlement that pre-dated the April 6, 1972, agreement (Borel) represented what was obviously a compromise.
 
 
 19
 Certainly the proffered evidence reveals nothing approaching a clear "course of dealing", in a Uniform Commercial Code sense, between the parties. See, e.g., Chase Manhattan Bank v. First Marion Bank, 437 F.2d 1040, 1045-46 (5th Cir. 1971). Nor was there ever offered, despite an expressed intention to offer, evidence of any widespread insurance industry "usage of trade" favoring the exposure theory and rejecting the manifestation theory.[8] Id. What was offered was a limited series of exchanges reflecting uncertainty, tentative positions, and compromise. Assuming that a Corbin approach should be encouraged, we are not convinced that the district court abused its discretion in rejecting this material. We have been pointed to no case where a judgment has been set aside because a court refused to admit extrinsic evidence offered in like circumstances. Moreover, having reviewed the offer of proof, we are convinced that it cannot reasonably be construed to establish the exposure theory as the proper interpretation of the Liberty Mutual policies or of the other policies agreed to later. Any error by the district court in excluding the evidence was therefore harmless, and cannot be the basis for modifying or vacating the court's judgment. Fed.R.Civ.P. 61; see, e.g., Hallmark Industry v. Reynolds Metals Co., 489 F.2d 8, 14 (9th Cir. 1973), cert. denied, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974).
 
 
 20
 Although in our view the medical testimony and the plain meaning of the policy language strongly support the manifestation approach, any remaining doubts about interpretation of the policies are properly resolved in favor of the insured, in order to effectuate the policies' purpose of providing coverage. Here, Eagle-Picher was uninsured prior to 1968, the period in which most of the injury-producing exposure took place. Yet Eagle-Picher purchased general liability insurance in 1968, and continued to purchase it in increasing amounts throughout the 1970's, even though it ceased to manufacture products containing asbestos in 1971 or 1972. Although, contrary to the district court's assertion, it is reasonable to assume that exposure to Eagle-Picher's products was continuing throughout the 1970's, see Forty-Eight, supra, 451 F.Supp. at 1233, such exposure was undoubtedly declining and not increasing. Coverage based on manifestation was certainly more desirable than coverage based on exposure, given that Eagle-Picher was uninsured during the longest period of exposure and that the number of claims was accelerating during the period of coverage. That Eagle-Picher and Liberty Mutual agreed to interpret their policies on a manifestation basis in April, 1972, also shows that Eagle-Picher intended such an approach once the issue of manifestation versus exposure had been considered. We therefore agree with the district court that, in this case, the public policy underpinnings of insurance law support the manifestation result.
 
 
 21
 On appeal, Eagle-Picher relies heavily on the policy of construing insurance contracts in favor of the insured to argue that all insurers on the risk from the period of initial exposure to the time of manifestation must provide coverage. This was the position recently adopted by Judge Bazelon for the court in Keene, supra. Although we agree with the Keene court that ambiguity must be resolved in favor of the insured, we believe the court's primary objective in these cases should be to ascertain the intentions of the parties. To state that a court must first "give effect to the policies' dominant purpose of indemnity", id. at 1041, is to weight too heavily a presumed intention to maximize coverage. But, given Eagle-Picher's stance in the district court, the rationale and holding of Keene are unavailing for another reason. In Keene, the court construed the policies in order to fulfill the "reasonable expectations of (the insured) when it purchased the policies." Id. at 1041, 1044-46. Whatever the expectations of the insured in that case, it is clear that Eagle-Picher had no similar expectations here, or it would certainly have argued such a theory in the court below.
 
 
 22
 We are also unable to agree with the analysis of the policy language and the medical evidence in Forty-Eight, supra, for the reasons outlined above. We note additionally, however, that there are factual differences between that case and this one. The extrinsic evidence in that case tended to show that the parties advocating the manifestation theory had previously adopted an exposure approach in handling early claims. Thus the manifestation approach was contradicted by the parties' prior construction of the policies.[9] Although we disagree with the Forty-Eight court as to the implications of the medical evidence and the plain meaning of the policy language, to the extent that the court was influenced by the evidence of the parties' intent and by the principle of maximizing coverage, it would have difficulty in rejecting the result we reach here.
 
 
 23
 Our construction of the contract language requiring bodily injury to "result" during the policy period is fully applicable to the identical language in the American Motorists agreement. While the coverage clause of the American Motorists policy, unlike the other policies, also refers to an "occurrence during the policy period", the definition of occurrence is identical to that in the other agreements, requiring the resulting injury, not the exposure, to take place during the policy period.
 
 
 24
 There are two plausible readings of the policy language. First, the requirement of an "occurrence during the policy period" might be intended simply to emphasize that the accident or exposure must "result(), during the policy period, in personal injury." Second, as American Motorists argues, the language might be designed to require the accident or exposure, as well as the resulting injury, to take place while the policy is in force. In ordinary personal injury cases, there will be no practical difference between these two interpretations: the accident and resulting injury take place almost simultaneously, and either both or neither will occur during the policy period. In latent injury cases, however, the construction favored by American Motorists would severely restrict coverage. Only in relatively few cases would a plaintiff be exposed and injured during a one year policy period. Given the identical definition of "occurrence" as in the other policies, and the absence of any extrinsic evidence to support a narrow interpretation, Eagle-Picher could reasonably expect meaningful coverage similar to its other policies. We therefore construe this ambiguous policy language in favor of Eagle-Picher in order to promote coverage, and rule that "occurrence during the policy period" means no more than that injury must result during the policy period as in the other agreements.[10]
 
 
 25
 Finally, although we agree with the district court that the manifestation approach is correct, we disagree as to the appropriate definition of the manifestation date. The court recognized that injury results when the disease is "capable of diagnosis", 523 F.Supp. at 115, but held that "the date of actual diagnosis" or the date of death triggers coverage under the policies, 523 F.Supp. at 118. This holding was designed "not only to reflect the manifestation concept, but also to ensure that coverage is certain, and (that) the availability of coverage is easily ascertained and easily demonstrated." Id. But administrative convenience, however desirable, cannot override the principles of construction we outlined earlier. The policy language clearly requires that exposure result in bodily injury during the policy period, not that the injury be medically diagnosed during the policy period. The existence of clinically evident, diagnosable disease is in no way dependent upon actual diagnosis.[11]
 
 
 26
 Courts and commentators which have interpreted analogous health insurance policies have reached a similar conclusion: a disease results "when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease." See, e.g., Malone v. Continental Life and Accident Co., 89 Idaho 77, 403 P.2d 225, 228 (1965); Broccolo, supra; Dowdall v. Commercial Travelers Mutual Accident Ass'n, 344 Mass. 71, 181 N.E.2d 594, 596 (1962) ("Knowledge of the existence of the disease on the part of the plaintiff was not required (to trigger coverage); it was sufficient if the disease had in fact originated prior to the effective date of the policy." Held, disease had originated prior to coverage even though definitive medical diagnosis was not made until after policy was in force.); Wilkins, supra; Couch on Insurance, supra, at 639. Cf. Cardamone v. Allstate Ins. Co., 49 Ill.App.3d 435, 7 Ill.Dec. 299, 364 N.E.2d 460, 462-63 (1977) (construing policy requiring that disease "first manifests itself" within a certain time to require symptoms to become manifest during that time, regardless of when diagnosis occurs).
 
 
 27
 We therefore hold that a disease "results" under the policies when it becomes clinically evident, that is, when it becomes reasonably capable of medical diagnosis.[12] Accordingly, the judgment of the district court is modified to read:
 
 
 28
 It is declared that the operative date for determining which of the several policies at issue here apply to a given claim or lawsuit in which damages are sought from plaintiff, Eagle-Picher Industries, Inc. is the date when the asbestos-related disease became reasonably capable of medical diagnosis.
 
 
 29
 As modified, the judgment below is affirmed.
 
 
 
 *
 Aldrich, J., a member of the panel hearing argument, later recused himself and was replaced by Campbell, J
 
 
 [1]
 The exposure theorists argue that the district court erred in adjudicating this case for several reasons. First, they argue that there was no "case or controversy" between Eagle-Picher and Liberty Mutual and that Liberty Mutual should therefore have been dismissed from the action. But this controversy was triggered by American Motorists' claim that Liberty Mutual was construing its policy incorrectly; the Liberty Mutual policy is at the heart of the case. The fact that Liberty Mutual and Eagle-Picher agreed about the underlying basis of coverage is no reason to dismiss Liberty Mutual from the action. See, e.g., Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co., 416 F.2d 707 (7th Cir. 1969)
 Second, they argue that the district court erred by denying their motion to transfer the case to the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a). The standard of review is a narrow one; we reverse only for an abuse of discretion. See, e.g., Codex Corp. v. Milgo Electronic Corp., 553 F.2d 735, 737 (1st Cir.), cert. denied, 434 U.S. 860, 98 S.Ct. 185, 54 L.Ed.2d 133 (1977). Given that Liberty Mutual has its principal place of business in Boston, and that the exposure theorists have not demonstrated any prejudice as a result of a Massachusetts forum, we cannot say that the district court abused its discretion by refusing to override Eagle-Picher's choice of forum.
 Finally, the exposure theorists urged the district court to deny declaratory relief because Eagle-Picher had failed to join additional insurers to this action. One of these insurers apparently provided first-layer excess coverage between 1968 and 1973; others provided additional umbrella coverage between 1973 and 1979. Eagle-Picher responded that it was entirely speculative whether these additional policies would ever be triggered. Without addressing the merits of this assertion, we note that our disposition of this case cannot be legally binding on non-parties. See, e.g., State Farm Mutual Automobile Ins. Co. v. Mid-Continent Casualty Co., 518 F.2d 292, 295 (10th Cir. 1975); Diamond Shamrock, supra. In any case, no motion to join these parties to the action was made, nor was there a showing that joinder would destroy diversity jurisdiction or would be infeasible for any other reason. See Fed.R.Civ.P. 19. Declaratory relief here will resolve the present controversy, and leave potential conflicts with the other insurers for another time. The motion to decline declaratory relief was therefore properly denied.
 
 
 [2]
 The exposure theorists sought a pre-trial ruling to determine whether the law of Ohio, Illinois, or England should control the interpretation of the policies. The district court concluded that there was "no true conflict among all potentially applicable laws" and therefore did not decide which state law applied. 523 F.Supp. at 116 n.5. Cf. Keene, supra, 667 F.2d at 1041 n.10 (similar). Although the basic principles of interpretation may not vary significantly from one jurisdiction to the next, we have sought to be consistent with Illinois and Ohio law, the parties having failed to indicate how the law of England might differ
 
 
 [3]
 The fiction that bodily injury is contemporaneous with exposure to asbestos seems to have even less factual basis with respect to other asbestos-related diseases, such as mesothelioma and broncheogenic carcinoma, than it does with respect to asbestosis. Although the likelihood of onset of these diseases appears to be dose-related, see Forty-Eight, supra, 657 F.2d at 815, they are apparently not cumulative in nature like asbestosis, see Vagley & Blanton, Aggregation of Claims: Liability for Certain Illnesses With Long Latency Periods Before Manifestation, 16 Forum 636 (Spring 1981). The district court did not consider these diseases separately from asbestosis, but the parties do not argue that they should be treated differently under the policies. Given the desirability of similar treatment of all asbestos-related diseases, the manifestation theory has the advantage of being more compatible with the medical evidence and the policy language. But cf. Keene, supra, 667 F.2d at 1038 n.3 (disregarding details of medical development of diseases); Forty-Eight, supra, 657 F.2d at 815 (relying on administrative convenience to treat mesothelioma and carcinoma under exposure theory in spite of contrary medical evidence)
 
 
 [4]
 We note that the Ohio courts have relied on definitions in Webster's Third New International Dictionary (1966) to determine the plain, ordinary meaning of language in insurance policies. See, e.g., Fuerstenberg v. Mowell, 63 Ohio App.2d 120, 409 N.E.2d 1035, 1036-37 (1978); Olmstead v. Lumbermens Mutual Ins. Co., 23 Ohio App.2d 185, 261 N.E.2d 671, 674 (1969), aff'd, 22 Ohio St.2d 212, 259 N.E.2d 123, 126 (1970)
 
 
 [5]
 Courts have also adopted a manifestation approach in areas of the law other than liability and health insurance. See, e.g., Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (statute of limitations for disease of silicosis does not begin to run until disease manifests itself, in spite of cumulative nature of disease); Clutter v. Johns-Manville Sales Corp., 646 F.2d 1151 (6th Cir. 1981) (under Ohio law, statute of limitations for asbestos-related disease does not begin to run until disease manifests itself); Grain Handling Co. v. Sweeney, 102 F.2d 464, 466 (2d Cir.) (L. Hand, J.), cert. denied, 308 U.S. 570, 60 S.Ct. 83, 84 L.Ed. 478 (1939) (under Longshoremen's Act, an industrial disease "is no disease until it manifests itself"). Although these and similar cases can be distinguished on various grounds, see, e.g., Keene, supra, 667 F.2d at 1043 & n.17; Forty-Eight, supra, 633 F.2d at 1220-22, they still support the argument that the manifestation theory is a reasonable approach to determining when disease results and that it comports with the common meaning of the language. Judge Hand's discussion, though admittedly in a different context, is particularly instructive:
 "Few adults are not diseased, if by that one means only that the seeds of future troubles are not already planted; and it is a common place that health is a constant warfare between the body and its enemies: an infection mastered, though latent, is no longer a disease, industrially speaking, until the individual's resistance is again so far lowered that he succumbs." Sweeney, supra, at 466.
 Moreover, we note that both the Keene and Forty-Eight courts acknowledged the force and relevance of the health insurance cases discussed in text. The Keene court accordingly adopted manifestation as one trigger of coverage; the Forty-Eight court distinguished the health insurance cases by relying on their underlying premise of construing policies in favor of the insured. Here, by contrast as discussed infra, this rule of construction supports the manifestation, not the exposure, theory.
 
 
 [6]
 The parties favoring the exposure theory also argued that extrinsic evidence of Eagle-Picher's insurance sophistication and bargaining power should have been admitted to rebut the presumption that the policies were contracts of adhesion. The court rejected the offer of evidence for this purpose, concluding that whether or not the policies were contracts of adhesion could be determined simply by reading the policies. Although the relative bargaining power of the parties would seem relevant to a determination of how strongly ambiguous language should be construed against the insurer who drafted the policy, compare Commercial Ins. Co. of Newark v. Gonzalez, 512 F.2d 1307, 1313 n.11 (1st Cir.), cert. denied, 423 U.S. 838, 96 S.Ct. 65, 46 L.Ed.2d 57 (1975), with Marston v. American Employers Ins. Co., 439 F.2d 1035, 1038-39 (1st Cir. 1971), we have not been pointed to any Ohio or Illinois cases which have abandoned entirely or even weakened the presumption of construing ambiguous language in favor of the insured upon a finding that the insured had significant bargaining power
 The proffered evidence does not demonstrate that Eagle-Picher had unusual sophistication with respect to liability insurance, or that its small corporate insurance department allowed it to bargain as an equal with insurance industry representatives. Certainly the offer of proof does not show that Eagle-Picher "had so actively participated in drafting (the policies) that it should be denied the benefit of the usual rule" of construction in favor of the insured. First Nat'l Bank of Decatur v. Insurance Co. of North America, 424 F.2d 312, 317 (7th Cir.) (Illinois law), cert. denied, 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970). In any case, the district court relied on the policy of liberal construction in favor of the insured only as an "additional strand of support", not as the pillar, for its holding. The court committed no mistake in construing the policies as it did, and any error in excluding evidence of Eagle-Picher's bargaining power was harmless. Fed.R.Civ.P. 61.
 
 
 [7]
 The Borel claim: Letters from Eagle-Picher forwarding the complaint to insurers in 1969 recognized the possibility of no coverage. Liberty Mutual, in a February, 1970, letter to Eagle-Picher indicated that it would cease to handle the claim if it determined there was no exposure during coverage. In June, 1971, Liberty Mutual acknowledged receiving Eagle-Picher's demand that Liberty Mutual assume total responsibility in a settlement; it refused and agreed to pay only 20% of the settlement. Eagle-Picher indicated in September, 1971, that the case settled for $5000, plus "the proportionate part of the compensation lien," and reserved its right to litigate the issue of coverage. In October Liberty Mutual paid half of the total settlement of $6225.55 and $7000 of total counsel fees of $22,028.78
 The Antholtz claim: In February, 1971, Eagle-Picher forwarded to Liberty a complaint alleging exposure during 1939-1967 which resulted in death in March, 1970, after the onset of asbestosis for "a period of several years". Eagle-Picher's letter acknowledged "the slim possibility of subsequent findings which would indicate exposure after the effective date of coverage." (In fact, there would seem to have been no coverage under either the exposure or manifestation theories, asbestosis having been alleged to have manifested itself prior to 1968.) Liberty Mutual responded that "in the event you feel there is coverage ... you will write us again." In May, 1971, Liberty Mutual wrote that it had determined there was no coverage because exposure was prior to 1968. A year later, on April 12, 1972 (six days after the April 6 manifestation agreement), Eagle-Picher paid $2000 to obtain a dismissal of the complaint with prejudice.
 The McDaniel claim: In July, 1971, Eagle-Picher forwarded to Liberty a claim for exposure during the years 1933 to 1968, with death occurring in March, 1968, after total disability and total loss of wages during the prior six months. Eagle-Picher noting the exposure dates, indicated on July 7, 1971, to Liberty that it would turn the case over to its own counsel for representation, but Liberty responded on July 19, 1971, by refusing to allow Eagle-Picher's counsel to handle the matter without home office approval. Long after the April 6, 1972 agreement, in July, 1975, Eagle-Picher paid all of a $4000 settlement and all but $700 of a $9000 counsel fee. As these facts indicate, manifestation apparently occurred prior to the January, 1968, date of Liberty Mutual's coverage.
 
 
 [8]
 Various amici curiae have sought to enlarge the record on appeal by offering evidence of the drafting history of the standardized liability policies at issue here, which is said to support the exposure position. But this is not the sort of material of which we may take judicial notice, and we may not ordinarily consider factual material not presented to the court below. See, e.g., Construction Aggregates Corp. v. Rivera de Vicenty, 573 F.2d 86, 95 n.7 (1st Cir. 1978). Nor will we reverse the district court on a ground not urged upon or considered by it, in the absence of exceptional circumstances not present here. See, e.g., Dobb v. Baker, 505 F.2d 1041, 1044 (1st Cir. 1974). For it is the duty of counsel in the first instance to determine whether there is material so likely to be known throughout the industry and by the parties that it should be proffered to the court
 
 
 [9]
 In addition, unlike the present case, the manufacturer in Forty-Eight was insured beginning in 1955, and carried insurance during a substantial period of exposure to its products. Noting that "the manufacturer will likely be unable to secure any insurance coverage in later years when the disease manifests itself", id. at 1219, the court concluded that the exposure construction would maximize the manufacturer's coverage, id. at 1223
 
 
 [10]
 The district court, in reaching this same conclusion, also relied on American Motorists Ins. Co. v. E. R. Squibb & Sons, Inc., 95 Misc.2d 222, 406 N.Y.S.2d 658, 659-60 (Sup.Ct.1978). Although that case involved an American Motorists policy, the language was apparently different. The American Motorists court did not state that the contract required an "occurrence during the policy period." Rather, the court concluded that the clear language keyed the resulting injury, not the exposure, to the policy period. If this was the case, the policy was essentially the same as that of Liberty Mutual and the other excess carriers here
 
 
 [11]
 Although the 1972 letter signed by Eagle-Picher and Liberty Mutual refers to the date of medical diagnosis as the trigger of coverage, this extrinsic evidence cannot be used to modify unambiguous language in the absence of a finding by the district court that the letter constituted a binding modification or reformation of the prior policies. The parol evidence rule would seem to bar the use of the 1972 letter to modify the clear terms of integrated agreements later entered into. See generally Corbin, supra, § 573; Williston, supra § 631
 
 
 [12]
 Eagle-Picher argues that a remand is appropriate to allow the district court to determine the extent of coverage once a policy is triggered. Under Eagle-Picher's proposed interpretation, "the insurer will pay all sums which the insured shall become obligated to pay because of all bodily injury to all claimants covered by the same accident or exposure to conditions, provided that the bodily injury of at least one claimant manifests itself during the policy period." (Emphasis in original.) It is not clear that this argument was ever raised before the district court. In any case, the proposal, though creative, is clearly without merit; the policies are geared to the injuries of a particular claimant, not to all claimants injured from the same exposure
 We have examined the remaining alleged errors, relating to discovery rulings by the district court, and have found no error of law or abuse of discretion.