777 F.2d 520
 HANCOCK LABORATORIES, INC., Plaintiff,
v.
ADMIRAL INSURANCE CO. and Mutual Fire, Marine and Inland
Insurance Company, Defendants.
MUTUAL FIRE, MARINE AND INLAND INSURANCE COMPANY,
Cross-Complainant and Appellee,
v.
ADMIRAL INSURANCE COMPANY, Cross-Defendant and Appellant.
 No. 83-6255.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 2, 1985.
As Amended March 11, 1986.
 
 Roy G. Weatherup, Kim H. Collins, Charles B. Smith, Haight, Dickson, Brown & Bonesteel, Santa Moncia, Cal., for cross-complainant and appellee.
 Gary L. Green, Hillsinger & Costanzo, Los Angeles, Cal., for cross-defendant and appellant.
 Appeal from the United States District Court for the Central District of California.
 Before CHAMBERS and PREGERSON, Circuit Judges, and REED,* District Judge.
 EDWARD C. REED, Jr., District Judge:
 Admiral Insurance Company (Admiral) appeals from the district court's judgment in favor of Mutual Fire, Marine and Inland Insurance Company (Mutual). A contaminated aortic heart valve, manufactured by Hancock Laboratories, Inc., (Hancock) was implanted in the heart of William Outlaw, Jr. The effects of the contamination were not immediately observed but eventually resulted in Mr. Outlaw undergoing a second operation for replacement of the contaminated valve. Mr. Outlaw brought suit for damages against Hancock Laboratories. Admiral insured Hancock for liability at the time of the implantation and for a period following this operation. Mutual insured Hancock for the remainder of the period following implantation until after the second implantation. The issue before the district court was whether Admiral or Mutual was obligated to provide Hancock with a defense in the Outlaw action. On appeal the issues are: (1) whether the district court's resolution of the dispute between Mutual and Admiral as to which company was obligated to provide a defense to Hancock in Outlaw's lawsuit for a negligently contaminated heart valve was correct; (2) whether the amount of attorneys' fees awarded by the district court was reasonable; and (3) whether settlement with the insured entitled the insurance company making such settlement to a credit in its obligation to the prevailing insurance company.
 I. STATEMENT OF FACTS
 Hancock filed the initial action in this case seeking a declaratory judgment construing the provisions of Hancock's insurance policies with Admiral and Mutual. Hancock Laboratories, Inc., v. Admiral Insurance Co., No. 79-3040-CBM (C.D.Calif. filed August 13, 1979). Mutual Insurance cross-complained against cross-defendant Admiral Insurance. Hancock's initial action was subsequently dismissed pursuant to stipulation. The cross-complaint, the case before this court, principally concerns a dispute between Mutual and Admiral as to which carrier or carriers were obligated as a matter of contract law under the insurance policies at issue to tender the defense of a negligence claim brought against Hancock.[1] The district court entered judgment in favor of Mutual for the amount it paid in settlement of the negligence action and the costs of defense, including attorneys' fees.
 Hancock manufactures various products, one of which is a porcine aortic heart valve.[2] On December 15, 1976, one of Hancock's valves was implanted into Mr. Outlaw. The Hancock valve was contaminated at the time of implantation with mycobacterium chelonei, an atypical organism.[3] On June 21, 1977, Mr. Outlaw was required to undergo another operation for the removal of the contaminated heart valve and implantation of a replacement valve. Mr. Outlaw subsequently brought suit against Hancock seeking two million dollars in damages and alleging that the porcine valve was negligently designed, manufactured, sterilized, tested and packaged.
 Prior to January 16, 1978, Hancock notified Admiral of Mr. Outlaw's lawsuit and requested that Admiral afford Hancock a defense. On January 17, 1978, Admiral refused to tender any defense in the Outlaw action.
 Shortly after Admiral's refusal to tender a defense, Mutual accepted the defense of the Outlaw action under a reservation of rights. Subsequently, Mutual settled with Mr. Outlaw for $150,000. This settlement was apparently reached on the third day of the trial of the Outlaw action. The trial court in this case found that the Outlaw settlement was reached in good faith. Further, the trial court found that Mutual expended $264,416.96 in defense costs, including attorneys' fees, in defense of the Outlaw action.
 II. STANDARD OF REVIEW
 To determine which insurance company was obligated to provide a defense to Hancock for the Outlaw action, the district court correctly reviewed the pertinent insurance policies. The principles of contract interpretation to be applied are reviewed de novo. Operating Engineers Pension Trust v. Charles Minor Equipment Rental, Inc., 766 F.2d 1301, 1303 (9th Cir. 1985).
 The trial court's award of attorneys' fees is reviewed for an abuse of discretion. See Diamond v. John Martin Co., 753 F.2d 1465, 1467 (9th Cir.1985).
 III. ANALYSIS
 A. WHETHER THE IMPLANTATION OF A CONTAMINATED HEART VALVE IS AN "OCCURRENCE" TO TRIGGER INSURANCE LIABILITY.
 Admiral issued an insurance policy to Hancock for the period April 10, 1976, to April 10, 1977. Hancock's general liability policy with Admiral had a combined single limit of liability of $300,000 for each "occurrence as respects bodily injury liability or property damage liability or any combination thereof."
 Mutual issued an insurance policy to Hancock for the period April 10, 1977, to April 10, 1978. Hancock's policy had a limit of $500,000 "for bodily injury or property damage caused by an occurrence provided such bodily injury or property damage arises out of the products [sic] hazard as defined herein and as specified in the Declarations and further provided that the occurrence takes place subsequent to the Retroactive Date [April 10, 1977] as stated in the Declarations." Thus, when Mr. Outlaw's valve was implanted on December 15, 1976, Admiral's policy was in effect and continued through April of 1977. From April of 1977 through the time the contaminated valve was removed in June of 1977, Mutual's policy was in effect.
 The two policies issued varied in certain areas. Admiral's policy did not define the terms "occurrence" or "bodily injury."[4] Mutual's policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage sustained after the Retroactive Date in the Declarations, neither expected nor intended by the Insured." These terms trigger the time and circumstances when coverage is mandated under a particular insurance policy and generally cause little difficulty in construing the policy.[5] In the usual case of injury both the occurrence and injury transpire simultaneously, or, at least in close temporal proximity to one another. However, in this and other continuous exposure cases, the patient has been infected with the disease before external observations reveal its existence. Mr. Outlaw's condition continually deteriorated because of the presence of the contaminated heart valve.
 We are called upon in this case to construe the pertinent provisions of the insurance policies outlined above. We must determine whether, as the district court found, the implantation of the contaminated heart valve triggered only Admiral's liability to tender a defense to Hancock for the Outlaw action or, as Admiral argues, whether Mutual shared liability on a pro rata basis with Admiral.
 Because bacterial infections, like the one in this case, exist before external observations reveal the diseases, it is often difficult to determine what occurrence triggers liability under a particular policy. The basic theories advanced by the courts in similar cases are the "exposure" theory, the "manifestation" theory, and the "continuous exposure" theory.[6] These theories have generally been addressed by courts faced with determining the insurance liability coverage in asbestosis[7] cases. See e.g. Insurance Co. of North America v. Forty-Eight Insulations, 633 F.2d 1212 (6th Cir.1980) clarified in part, 657 F.2d 814, cert. denied, 455 U.S. 1099, 102 S.Ct. 1648, 71 L.Ed.2d 878 (1982); Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C.Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).[8]
 The Sixth Circuit follows the exposure theory and holds that the obligations imposed upon insurance companies by the standard comprehensive general liability policy are triggered by "exposure" to asbestos-containing products during the policy period. Insurance Co. of North America v. Forty-Eight Insulations, 633 F.2d at 1225. In accord Porter v. American Optical Corp., 641 F.2d 1128. Under the exposure theory, which applies to diseases that are cumulative and progressive, bodily injury occurs when an exposure causing tissue damage takes place and not when physical symptoms caused by the disease manifest themselves.
 The District of Columbia Circuit, taking the exposure theory a step further, adopts the continuous exposure theory and holds that coverage is triggered by either exposure to asbestos products, i.e., injury suffered to the tissue after the asbestos fibers are imbedded in the tissue, or manifestation of asbestos-related disease during the policy period. Keene Corp. v. Insurance Co. of North America, 667 F.2d at 1047; A C and S, Inc. v. Aetna Casualty and Surety Co., 764 F.2d 968, (3rd Cir.1985).
 The First Circuit adopts the manifestation theory and concludes that coverage under these types of insurance policies is triggered by a claim that an asbestos disease has manifested itself during the policy period. Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co., 682 F.2d 12, 24 (1st Cir.1982), cert. denied, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). Cf. Todd Shipyards Corp. v. Black, 717 F.2d 1280 (9th Cir.1983), cert. denied, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984) (under the Longshoremen's and Harbor Workers' Compensation Act Congress intended to hold the last covered employer, who causes or contributes to the occupational injury, completely liable once the injury has manifested itself.)
 Admiral appears to contend that this court should adopt the continuous exposure theory.[9] Mutual, on the other hand, contends that this court should adopt the exposure theory. We must determine whether coverage liability was only triggered by the exposure, that is to say, the implantation of the contaminated porcine valve or whether liability was also triggered by the continuous growth of bacteria throughout both insurance policy periods. The record indicates that following exposure to the contaminated valve, the bacteria continued to grow. The infectious disease process resulting from the contaminated Hancock heart valve is similar to a cumulative progressive type of disease rather than a common type of disease or ordinary accident.
 Just as an exposure to asbestos sets in motion the progressive disease of tissue damage, the exposure in this case set in motion the growth of bacteria. In the asbestos cases, the injured is usually exposed to asbestos more than once. Each time the injured breathes asbestos, additional fibers are inhaled resulting in additional scar tissue. "Bodily injury" and "exposure" fall within the definition of "occurrences" for the purpose of determining that insurance coverage occurs at the inhalation of asbestos fibers. The presence of asbestos fibers then causes a cumulative and progressive disease process, asbestosis. Under the exposure theory, each inhalation is an "exposure," triggering insurance liability. In this case, Outlaw was exposed to only one injury causing agent, the implantation of the contaminated heart valve.
 Thus, the "exposure" and the "bodily injury" which results in insurance coverage was the implantation of the contaminated valve. The contaminated valve exposed Mr. Outlaw to the mycobacterium chelonei at the time of implantation. The continued presence of the bacteria caused a cumulative and progressive disease process.
 We find that the California Supreme Court would adopt the exposure theory to determine when bodily injury occurs. Insurance liability policies should be interpreted to promote coverage and to fulfill the dominant purpose of providing indemnification. The exposure theory provides coverage and enables the insurance companies to determine their liabilities. As in this case, it will not be difficult to determine when an injured person was exposed to the particular agent which caused the bodily injury.
 We find that the California Supreme Court would not adopt the continuous exposure theory. The basis for the reasoning in Keene was a perceived difficulty in determining medically how or when the injury occurs in an asbestos inhalation. However, this seems to ignore the pragmatic concerns of a court. A court should have no difficulty in determining when an exposure to any injury causing agent occurred.
 This court finds that the California Supreme Court would reject the manifestation theory. Under the manifestation theory, coverage can become illusory when the manufacturer of a product is faced with an increasing rate of injured persons. At a certain point, the manufacturer will be unable to secure any insurance coverage. Thus, when some of the injured persons manifest their injury, there will be no insurance.
 Under the circumstances, it is probable that the California Supreme Court would find the reasoning and results of the Sixth Circuit in Forty-Eight Insulations to be correct. An insurer is liable for any period where there was an exposure to an injury causing agent.
 Admiral does not argue that it was not liable at all for Hancock's insurance coverage. Rather Admiral argues that its coverage of Hancock should be prorated between itself and Mutual based on the district court's finding that there was a continuous exposure. Admiral contends that the implantation of the contaminated valve merely began the continuing disease process. Admiral argues that each insurance company which provided coverage during the time that the valve was in Mr. Outlaw is liable.
 Admiral relies on Forty-Eight Insulations to support its argument for proration. Admiral, however, misreads the case. First, Admiral argues that the district court erroneously adopted the exposure theory but then failed to carry it to its conclusion in apportioning liability as the Forty-Eight Insulations court did. However, that court found that only those insurance companies who were at risk at different times of exposure were liable.[10] In other words each time the injured breathed asbestos, there was an exposure, and all insurance companies which had provided coverage at the time of an exposure were liable. Further, that court specifically noted that an insurer cannot be liable when no exposure takes place. Forty-Eight Insulations, 633 F.2d at 1225. In this case we have only one exposure, at the time of the implantation of the contaminated valve. Therefore, the reasoning of the district court was correct in holding that Admiral was completely liable as it was the only insurance company at risk at the time of the exposure. Accordingly, the district court's judgment is affirmed.[11]
 B. WHETHER THE AWARD OF ATTORNEYS' FEES WAS REASONABLE.
 State law governs whether there should be an award of attorneys' fees in diversity actions. Shakey's Inc. v. Covalt, 704 F.2d 426, 435 (9th Cir.1983). The parties agree that California law imposes liability for attorneys' fees on Admiral's refusal to tender a defense to Hancock. Admiral, however, challenges the manner in which the court made its award and alleges that the amount of award was manifestly unreasonable.
 Under California law, the general rule is that the amount of an attorneys' fee award is within the sound discretion of the trial court in the absence of a patent abuse of that discretion. County of Madera v. Forrester, 115 Cal.App.3d 57, 65, 170 Cal.Rptr. 896, 900 (1981);[12] accord Diamond v. John Martin Co., 753 F.2d 1465, 1467 (9th Cir.1985).
 The district court made a finding based on evidence submitted that Mutual had expended the sum of $264,416.96 in defense costs including attorneys' fees in the Outlaw action.[13] The district courts' finding was not an abuse of discretion.
 C. WHETHER ADMIRAL'S SETTLEMENT WITH HANCOCK ENTITLED ADMIRAL TO A $45,000 CREDIT AGAINST ITS OBLIGATION TO MUTUAL.
 Admiral argues for the first time on appeal that the $45,000 it paid to Hancock for settlement of claims should be offset against the judgment to Mutual. Admiral contends that Mutual will realize a double recovery resulting from Admiral's payment to Hancock of the $45,000. There is nothing in the record to base a finding of double recovery. The record does not disclose the reason for the settlement payment by Admiral to Hancock except that it was for a release of all claims of Hancock against Admiral. Admiral wrongfully withheld a defense of Hancock. The $45,000 may very well have been paid by Admiral to avoid the possibility of punitive damages.
 It may be a coincidence that the amount paid to Hancock corresponds to the difference in the amount of the deductible of the Admiral policy ($5,000) and the Mutual policy ($50,000). However, there is no evidence that Hancock was required to pay its deductible to Mutual.[14]
 In any event, "[i]ssues not presented to the trial court should not be considered on appeal unless injustice might otherwise result or where the issue involves only questions of law." Collins v. Thompson, 679 F.2d 168, 171 (9th Cir.1982) (citations omitted). Mutual's counsel represented to this court at oral argument that Hancock made no agreement to pay the $45,000 it received to Mutual. Admiral raises no facts which indicate that any injustice would result. Admiral raises a purely factual issue. The record is not developed. Thus, this issue cannot be raised on appeal.
 
 
 1
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Edward C. Reed, Jr., Acting Chief United States District Judge, District of Nevada, sitting by designation
 
 
 [1]
 Mutual is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. Admiral is a Texas corporation with its principal place of business in Hartford, Connecticut. Thus, this is an appeal from a diversity action with substantive law of California applicable. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)
 
 
 [2]
 A porcine aortic valve is a valve which is taken from a pig's heart, sterilized, placed in a frame, and used in humans as a replacement valve in the aorta
 
 
 [3]
 When the Hancock valve was implanted into Mr. Outlaw on December 15, 1976, part of the package which had contained the valve was returned to Hancock for culturing in its labs. In early January, 1977, Hancock determined that organisms, identified as mycobacterium chelonei, had been present in the package
 
 
 [4]
 The failure to define "bodily injury" and "occurrence" created an ambiguity and uncertainty as to their meanings. The meanings of words which are not defined are ascertained by reference to the insured's reasonable expectation of coverage and any ambiguities or uncertainties are to be resolved against the insurer. See Insurance Company of North America v. Sam Harris Construction Co., 22 Cal.3d 409, 583 P.2d 1335, 149 Cal.Rptr. 292 (1978)
 
 
 [5]
 General principles of insurance policy interpretation are: (1) the objective in construing the policies' coverage of liability must be to give effect to the policies' dominant purpose of indemnity; (2) ambiguity in an insurance contract must be construed in favor of the insured; (3) the Court should ordinarily strive to give effect to the objectively reasonable expectations of the insured. See Couch on Insurance 2d Secs. 15:41, 15:14, 15:16, 15:74 (2d ed. Anderson 1959); Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034, 1041-1042 (D.C.Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982)
 
 
 [6]
 A review of California law reveals that the California Supreme Court has not yet addressed the specific issues before this Court
 
 
 [7]
 Asbestosis, a progressive disease, occurs when fibrous lung tissue surrounds small asbestos particles which have been excessively inhaled into the lungs
 
 
 [8]
 These cases were also diversity actions. The respective courts looked to the law of the appropriate state. The applicable law of the state gave only general guidance
 
 
 [9]
 Prior to this litigation, Admiral apparently contemplated the application of the exposure theory to their claims. The Admiral policy provided that in determining the limits of their liability, "all bodily injury ... arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." This clause is a recitation of the exposure theory and the result in this case is, therefore, precisely what Admiral bargained for when entering into the policy with Hancock
 
 
 [10]
 One California appellate court, in the context of insurance liability for property damage, does find successive insurers to be jointly and severally liable. See California Union Ins. Co. v. Landmark Ins. Co., 145 Cal.App.3d 462, 193 Cal.Rptr. 461 (1983). California Union involves damages resulting from the installation of a leaking swimming pool. The construction of a leaky pool may be likened to the implantation of the contaminated porcine heart valve. In California Union the continuous leaking of the pool caused damage to the adjacent land and in this case the bacteria in the heart valve caused damage to the adjacent heart muscle. The damage in both cases occurred on a progressive basis. However, this court must determine what the California Supreme Court would rule and is not bound to prorate based upon California Union, a decision of a court of appeals of California, for several reasons. First, this court is not bound by an intermediate state appellate court ruling. See Commissioner v. Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). Second, the appellate court, in finding the insurance companies jointly and severally liable, cited with approval the Forty-Eight Insulations case but the California court erroneously applied its holding. Third, the appellate court failed to distinguish between the exposure and the resulting continuous damage process. Also, the court failed to recognize the distinction between the exposure theory and the continuous exposure theory. Furthermore, the California Union court found that there was one continuous occurrence throughout the policy periods. In contrast, the trial court found that in this case, there was one exposure with a progressive disease resulting from the exposure
 
 
 [11]
 Although the district court found bad faith and wrongful refusal by Admiral, we need not address this issue because Admiral is liable under its insurance policy
 
 
 [12]
 The trier of fact in California may determine what is a reasonable amount to be allowed as attorneys' fees without hearing any testimony and without making any specific findings. See Clejan v. Reisman, 5 Cal.App.3d 224, 84 Cal.Rptr. 897, 908 (1970); Pehau v. Stewart, 112 Cal.App.2d 90, 245 P.2d 692, 697 (1952). Judges may rely on their own knowledge and experience to know reasonable attorneys' fees. See Scott, Blake & Wynne v. Summit Ridge Estates, Inc., 251 Cal.App.2d 347, 59 Cal.Rptr. 587, 594 (1967). The major factors considered by California courts in determining the reasonableness of attorneys' fees are the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, the attorney's learning, age and experience in the particular type of work demanded; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed. See Berry v. Chaplin, 74 Cal.App.2d 669, 679, 169 P.2d 453, 460 (1946). The determination of what constitutes reasonable attorneys' fees is committed to the sound discretion of the trial court, and an appellate court (in California) will interfere with that determination only where there has been a manifest abuse of discretion. See Walters v. Marler, 83 Cal.App.3d 1, 37, 147 Cal.Rptr. 655, 677 (1978)
 
 
 [13]
 As noted previously in this opinion, Mr. Outlaw sought two million dollars and settlement was not reached until the third day of trial in that action
 
 
 [14]
 Admiral's entire argument is based on a purported and inapplicable comment by Mutual's counsel at trial that "... all they [Hancock] are seeking and what they got was their $45,000 difference in the deductible."